# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **JOHN LANDY, *et al.*,** | : | |
| | : | Civ. No. 2:11-5862 (KM) |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **OPINION** |
| | : | |
| **JENNIFER VELEZ, Commissioner** | : | |
| **of the New Jersey Department of** | : | |
| **Human Services, *et al.*,** | : | |
| | : | |
| **Defendants.** | : | |

## KEVIN MCNULTY, U.S.D.J.:

John Landy and Margaret Sauchelli bring this action against Jennifer Velez, Commissioner of the New Jersey Department of Human Services ("DHS"), and Valerie Harr, Director of the DHS Division of Medical Assistance and Health Services.[1] DHS administers Medicaid, which is a means-tested program. At some point, Plaintiffs transferred certain assets to others as gifts, exposing themselves to a penalty period of ineligibility (the "Gift Transfer Penalty Period"). Then, shortly before they applied for Medicaid, Plaintiffs rid themselves of cash by lending it out and taking back Promissory Notes.[2] Landy and Sauchelli allege that DHS erred in ruling that the Promissory Notes rendered them currently ineligible for Medicaid. Applying certain regulatory criteria, Plaintiffs insist that these are bona fide promissory notes; they further contend that this categorization in effect is a safe harbor, one that prevents DHS from treating the notes as available assets. I hold that DHS was entitled to treat these Promissory Notes as available, countable assets for purposes of determining Medicaid eligibility.

Medicaid, created by the Social Security Amendments of 1965, is a joint federal-state program. It essentially covers health and nursing care for people

---

[1] This Opinion will refer to the Defendants collectively as DHS.

[2] The "Promissory Notes" or the "Notes" refer to three instruments described in detail at Sections I.A and B, *infra*. In using that terminology, I am not equating these instruments with bona fide promissory notes, a term of art for purposes of Medicaid eligibility.

with low incomes and limited resources. Medicaid is need-based, and therefore means-tested. To be eligible for Medicaid, a person cannot have income in excess of a prescribed threshold, which is tied to the federal poverty line. The applicant's available and countable resources, too, cannot exceed a prescribed threshold (for present purposes, $2,000).[3]

Plaintiffs here, like many older people, are burdened by nursing care expenses that threaten to deplete their assets. Medicaid is intended to help with such expenses, but it is not intended to stave off the depletion of assets. To the contrary, Medicaid requires that individuals nearly exhaust their available and countable resources before drawing on public funds. It is possible to disagree with that policy; in some cases it may seem unduly harsh, and in others it may seem to reward spendthrifts who wasted, instead of husbanded, their resources. Such policy debates, however, are not for this Court; I am constrained to take the law as I find it.

I have elected to decide the issue before me without delving too deeply into the arcana of elder law and Medicaid planning. Suffice it to say that the status of the Promissory Notes interacts with the Gift Transfer Penalty Period, and is an integral part of Plaintiffs' Medicaid planning. At oral argument, the parties agreed that the length of the period during which Medicaid assistance is not available will depend on, *inter alia*, whether the Notes are considered available and countable assets.[4]

---

[3] Certain assets, such as a home, household goods, and an automobile are generally not counted. *See* N.J. Admin. Code § 10:71-4.2(a) & 4.4(b).

[4] The reader may wish to consult other sources to obtain a background understanding of Medicaid asset sheltering strategies. *See, e.g.,* Catherine M. Reif, *A Penny Saved Can be a Penalty Earned,* 34 N.Y.U. Rev. L. & Soc. Change 339 (2010) (discussing changes to Medicaid law regarding asset transfers and suggesting till-available strategies); Jennifer B. Cona, *Promissory Notes and Medicaid Planning,* N.Y.L.J. Sept. 21, 2009 (article behind paywall) (describing Medicaid promissory note planning strategy, but warning of "uncertainties" and stating that it is "not for the weak of heart"). To oversimplify greatly: The Gift Transfer Penalty Period is intended to render an applicant ineligible for a period corresponding to the length of time it would have taken to exhaust the transferred asset on nursing care expenses. In short, the applicant is treated much as if he or she had retained the transferred asset for the duration of the Gift Transfer Penalty Period. By using ready cash to purchase a promissory note during the Gift Transfer Penalty Period, and then spending the note repayment proceeds on nursing care, the applicant seeks to minimize the period of ineligibility. The Gift Transfer Penalty Period starts to run on "the date on which the individual is [otherwise] eligible" for Medicaid. 42 U.S.C. § 1396p(c)(1)(D)(ii). According to plaintiffs, the Gift Transfer Penalty Period should therefore start to run as of the

Landy and Sauchelli move for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a), arguing that they are likely to succeed on the merits because DHS wrongfully treated the Promissory Notes as available, countable resources that rendered them ineligible for Medicaid. I believe that, for purposes of determining Medicaid eligibility, DHS was entitled to do so. Landy and Sauchelli are therefore unlikely to succeed on the merits and their motion for a preliminary injunction is denied.

In addition to opposing the preliminary injunction motion, DHS moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. The parties agree that there are no genuine issues of material fact.[5] The Court heard oral argument on the motions on March 11, 2013.

## I.    FACTS AND PROCEDURAL BACKGROUND

The essential facts underlying this suit are not in dispute.[6] The DHS Division of Medical Assistance and Health Services is responsible for administering New Jersey's Medicaid program. (Second Am. Compl. [ECF No. 30] at ¶ 5). Landy and Sauchelli are elderly persons who purchased the Promissory Notes and subsequently applied for Medicaid benefits. (Id. at ¶¶ 2, 21, 24, 25, 28, 29). DHS declared Landy and Sauchelli to be currently ineligible. It ruled that the Promissory Notes were available resources that placed Landy and Sauchelli above the $2,000 maximum asset level for Medicaid eligibility. (Id. at ¶ 30, Exs. D-1 and D-2). To challenge that decision, Landy and Sauchelli filed this action.

---

date they applied for, and were entitled to receive, Medicaid assistance, as a result of having exchanged available cash for promissory notes. DHS replies that Plaintiffs were *not* eligible for Medicaid as of the date they applied, because the promissory note should be considered an available, countable resource.

[5] At oral argument, DHS stated that the record was complete, and counsel for Landy and Sauchelli concurred that the record was sufficient for decision of both pending motions.

[6] Landy and Sauchelli stipulated to DHS's Statement of Undisputed Material Facts and added a handful of additional material facts. (Pl. Opp. at 5 [ECF No. 45]). DHS did not dispute these additional facts in its reply papers. In their brief opposing summary judgment, Landy and Sauchelli point to a number of statements in DHS's brief that they claim are disputed facts. These, however, are more properly viewed as arguments or conclusions, not factual allegations, as I discuss in Section III, *infra* at p. 24.

A. John Landy

John Landy was born on December 22, 1926, and is now 86 years old.

In 2009, Landy made two gift transfers to his daughters: $80,000 in February and $100,000 in October. (Second Am. Compl. ¶ 45 [ECF No. 30]). He acknowledges that these gift transfers subject him to a Medicaid ineligibility period of 24.71 months. (*Id.* ¶ 46).

On April 16, 2010, Landy purchased from Deldor Realty Corp. ("Deldor Realty"), his former employer, a demand promissory note in the amount of $100,000, bearing an annual interest rate of 4.00% (the "Landy April 16 Note"). (Statement of Undisputed Material Facts, ¶ 5, Ex. A [ECF No. 40-1]). Ralph Nazar signed on behalf of the borrower, Deldor Realty. (*Id.*). The note (1) was not backed by any collateral, (2) did not have a repayment term that was based on any actuarial calculations, and (3) did not provide for equal payments for the term of the loan. It did contain an acknowledgement of an obligation to repay and a requirement that the note to be paid up upon Landy's death. (*Id.*, Ex. A).

On October 29, 2010, Landy and his wife, who is now deceased, entered into another promissory note with Deldor Realty for an additional $100,000 (the "Landy October 29 Note"). (Statement of Undisputed Material Facts, Ex. B [ECF No. 40-1]). The Landy October 29 Note bears an annual interest rate of 1% and requires monthly payments for 25 months, a period that corresponded to Landy's actuarial life expectancy. (*Id.*, citing Social Security Administration Life Expectancy Tables.). That Note contained an acknowledgement of the obligation to repay, prohibited balloon or deferral payments, and required payment of the note upon Landy's death. (*Id.*). Ralph Nazar again signed on behalf of the borrower, Deldor Realty. No collateral secured the note. (*Id.* ¶ 12, Ex. B).

On October 20, 2010, just before entering into the second note, Landy obtained a credit check on "R. Nazarzadeh." (Statement of Undisputed Material Facts, ¶ 9 [ECF No. 40-1]). That check yielded credit scores of 701, 750, and 774. (*Id.*, Ex. K [ECF No. 40-2]). On November 15, 2010, after executing both notes, Landy ran a judgment check on "Ralph Nazar," which showed that no judgments were outstanding. (*Id.*, Ex. L).

On November 18, 2010, Landy applied for Medicaid benefits through the Global Options Assisted Living Waiver Program.[7] (Statement of Undisputed Material Facts, Ex. D [ECF No. 40-1]). By excluding the prior gift transfer and the two Landy promissory notes, he was able to declare available and countable resources of just $1,000. He also declared approximately $2,200 in monthly income.

On April 14, 2011, the local county welfare agency found that Landy was not eligible for Medicaid. Because the agency considered the amounts under the Landy Notes to be available, countable resources, it found that Landy's resources exceeded the $2,000 maximum for an individual. (Id., Ex. E).

Of the total $200,000 combined principal of the Landy Notes, $135,177.00 had been repaid as of December 31, 2012. (Rado Cert. ¶ 3A [ECF No. 51]).

### B. Margaret Sauchelli

Plaintiff Margaret Sauchelli was born on September 13, 1915; she is now 97 years old.

In approximately 2008, Margaret Sauchelli sold her house, which she owned jointly with her son John. John received Margaret's half of the sale proceeds, as well as his own.[8] This was a gift transfer that delayed Medicaid eligibility. (Pl. Opp. at 2 [ECF No. 45]).

On December 29, 2011, Sauchelli purchased a $78,000 promissory note from her granddaughter, Jill Connelly (the "Sauchelli Note"). (Id. ¶¶ 13-14, Ex. F). The note carried an annual interest rate of 1% and required monthly payments based on Sauchelli's actuarial life expectancy of 2.41 years. (Id., Ex. F). The actual payment plan, however, consisted of monthly payments of $6,058 per month for 12.78 months. (Id.). The Note also contained an acknowledgement of the obligation to repay, prohibited balloon or deferral

---

[7] The Global Options program is designed "to help eligible individuals remain in the community . . . rather than be cared for in a nursing facility or hospital setting." N.J.A.C. § 10:49-22.1(a).

[8] The allegations in the Second Amended Complaint (Second Am. Compl. ¶ 26 [ECF No. 30]) differ slightly from those in Sauchelli's motion papers and the statements of her counsel at oral argument. In any case, Sauchelli admits that she made a gift transfer to her son related to the ownership of her home. The particular details are not material to my decision.

payments, and required payment of the Note upon Sauchelli's death. (*Id.*). No collateral secured the Note. (*Id.* ¶ 12, Ex. F).

On January 4, 2012, after executing the note but before transferring any money, Sauchelli obtained a credit check on her granddaughter, Connelly. (*Id.* ¶ 15 [ECF No. 40-1], Ex. M [ECF No. 40-2]). The credit check revealed credit scores of 725, 739, and 741. (*Id.*, Ex. M).

On February 15, 2012, Sauchelli applied for Medicaid benefits through the Medicaid Only program. (*Id.*, Ex. G). By excluding the prior gift transfer and the Sauchelli Note, she was able to declare resources of just $1,900. She declared monthly income of $7,400: $1,300 from Social Security and $6,100 from the promissory note.

On May 16, 2012, the local county welfare agency found that Sauchelli was not eligible for Medicaid. The agency considered the sum represented by the Sauchelli Note to be a countable and available resource, which placed her assets above the $2,000 maximum. (*Id.*, Ex. H).

Jack Sauchelli, Ms. Sauchelli's son, who has power of attorney, asserts that the Sauchelli Note has now been paid in full. (Sauchelli Cert. ¶ 3A [ECF No. 51-1]).[9]

C. Procedural History

On October 7, 2011, Sauchelli and Landy brought this action pursuant to 42 U.S.C. § 1983. They contend that DHS acted contrary to law when it treated each of their Promissory Notes not as a bona fide promissory note but as an available and countable resource, *e.g.,* a non-bona fide note or cash loan, or else a trust-like device. Correcting that alleged error, Plaintiffs contend, would render them eligible for Medicaid benefits at an earlier date than would otherwise apply.

---

[9] The Medicaid statute provides payments for three months prior to the applicant's date of eligibility. 42 U.S.C. § 1396a(34). Therefore, a federal court may award retroactive benefits for that three-month period, beginning with the date that an order would be entered in the plaintiff's favor. This provision waives the general Eleventh Amendment bar against a court awarding retroactive payment of benefits. *Edelman v. Jordan*, 415 U.S. 651 (1974); *Morenz v. Wilson-Coker*, 415 F.3d 230, 237 (2d Cir. 2005). This three-month window applies to the Medicaid Only program, to which Sauchelli applied.

On August 17, 2012, Landy and Sauchelli moved for a preliminary injunction. DHS opposes the preliminary injunction motion and has also cross-moved for summary judgment.

This Court has federal-question subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

## II. MOTION FOR PRELIMINARY INJUNCTION

### A. Governing Standards

#### 1. Preliminary Injunction Standards

Landy and Sauchelli argue that their Promissory Notes satisfy the federal Medicaid statute's criteria for a bona fide promissory note. Thus, Landy and Sauchelli argue, any further evaluation of whether the Notes are trust-like devices was unwarranted. In the alternative, Landy and Sauchelli claim that the Notes are not trust-like devices because there is no fiduciary relationship, but only a standard debtor-creditor relationship, with the borrower.

DHS responds that these Promissory Notes are countable, available resources. They represent funds that were, and perhaps are, available for the payment of nursing care expenses. I agree, and find that Plaintiffs have failed to make a sufficient showing of likelihood of success on the merits to justify a preliminary injunction.

> "A plaintiff seeking a preliminary injunction must establish
>
> [1] that he is likely to succeed on the merits,
>
> [2] that he is likely to suffer irreparable harm in the absence of  preliminary relief,
>
> [3] that the balance of equities tips in his favor, and
>
> [4] that an injunction is in the public interest."

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (line breaks and numbering added); *accord American Express Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012); *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004); *see Adams v. Freedom Forge Corp.*, 204 F.3d 475, 486 (3d Cir. 2000) (movant bears the burden of establishing

these elements).

A Court will consider all four factors, but the first two are essential: A court may not grant injunctive relief, "regardless of what the equities seem to require," unless plaintiffs carry their burden of establishing both a likelihood of success and irreparable harm. *Adams*, 204 F. 3d at 484; *accord Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 197 (3d Cir. 1990) ("[W]e cannot sustain a preliminary injunction ordered by the district court where either or both of these prerequisites [*i.e.*, irreparable harm and the likelihood of success on the merits] are absent." (quoting *In re Arthur Treacher's Franchisee Litig.*, 689 F.2d 1137, 1143 (3d Cir. 1982)); *Morton v. Beyer*, 822 F.2d 364, 367 (3d Cir. 1987); *Freixenet, S.A. v. Admiral Wine & Liquor Co.*, 731 F.2d 148, 151 (3d Cir. 1984); *American Express*, 669 F.3d at 366, 374. I give particular weight here to likelihood of success on the merits, because the relief sought is an order compelling the government to comply with a statute or rule.

### 2. *Medicaid, Countable Resources and POMS*

Medicaid is designed to provide medical assistance to "families with dependent children and [to] aged, blind, or disabled individuals, whose income and resources are insufficient to meet the cost of necessary medical services . . . ." 42 U.S.C. § 1396-1. Although it is a federal program, it is implemented by the states. States that elect to participate in Medicaid must comply with the Medicaid statute and federal regulations. *See generally* 42 U.S.C. § 1396a. New Jersey elected to participate in Medicaid via the passage of the New Jersey Medical Assistance and Health Services Act. N.J. Stat. Ann. § 30:4D-1, *et seq.* That Act designated the Division of Medical Assistance and Health Services, within DHS, as the agency that would administer the state program. N.J. Stat. Ann. § 30:4D-4, -5, -7.

Medicaid contains a number of sub-programs, including Global Options Assisted Living ("Global Options"), for which Landy applied, and Medicaid Only, for which Sauchelli applied. (Statement of Undisputed Material Facts, Exs. D and G [ECF No. 40-1]). DHS has contracted with county welfare agencies to determine whether individuals are eligible for such programs. N.J. Admin. Code § 10:71-1.5. When determining eligibility for Medicaid benefits, the State must use a methodology that is "no more restrictive than the methodology which would be employed under the supplemental security income [SSI] program." 42 U.S.C. § 1396a(a)(1)(C)(i)(III). The New Jersey requirements substantially mimic the federal SSI requirements.

To be eligible for the Global Options and Medicaid Only programs, an individual may not possess available, countable resources in excess of $2,000. N.J. Admin. Code § 10:71-4.5(c). A "resource" is defined as "any real or personal property which is owned by the applicant (or by those persons whose resources are deemed available to him/her, as described in N.J. Admin. Code § 10:71-4.6) and which could be converted to cash to be used for his/her support and maintenance." N.J. Admin. Code § 10:71-4.1(b). A resource is "available" when the person has the right, authority or power to liquidate it. N.J. Admin. Code § 10:71-4.1(c). A resource is "countable" if it is not subject to a specific exclusion. For example, the regulations generally exclude a home, household goods, and an automobile from being counted. *See* N.J. Admin. Code § 10:71-4.2(a) & 4.4(b).

Individuals have attempted by various means to shelter resources – *i.e.*, to purposely render them not currently "available" – in order to qualify for Medicaid. Congress has responded by putting in place more stringent requirements pertaining to the characterization, transfer and divestiture of assets.

One such sheltering strategy is crude and straightforward: the transfer of an asset as a gift, or for less than fair market value. Congress has attempted to remove any economic incentive to pursue that strategy by imposing a penalty period, during which the transferor is ineligible to receive Medicaid benefits. 42 U.S.C. § 1396p(c).[10]

A second sheltering strategy is the placement of assets in a trust. In 1999, Congress amended the statute to close that loophole. A trust or a "legal instrument or device that is similar to a trust," sometimes called a "trust-like device," is now deemed a countable, available asset of the beneficiary. 42 U.S.C. § 1382b(e)(6)(A) (SSI); 42 U.S.C. §1396p(d)(6) (Medicaid). Thus DHS will determine whether a trust-like device is being used to park assets in friendly hands.

A third sheltering strategy is to lend out cash, either informally or by purchasing a promissory note, as Plaintiffs did here. A cash loan or promissory note may, however, be considered a countable and available resource in three

---

[10] The gift transfers that preceded the Promissory Notes in this case concededly expose Plaintiffs to such a penalty period. Plaintiffs' contention is essentially that they may use the promissory note repayment proceeds to pay nursing home expenses while the Gift Transfer Penalty Period is running. Doing so, they believe, would shorten their period of ineligibility.

ways: the funds could be deemed "available," the purchase of the note could be deemed an asset transfer for less than fair market value, or the loan/note could be deemed a trust-like device.

Since the Medicaid amendments of 2005, promissory notes have received special scrutiny to determine whether they are "bona fide." Earmarks of a bona fide promissory note include (1) an actuarially sound repayment term, (2) equal payments for the term of the loan with no deferral or balloon payments, and (3) no cancellation of the debt in the event of the lender's death. 42 U.S.C. § 1396p(c)(1)(I)(i)-(iii). *See also* Center for Medicaid and State Operations, *Sections 6011 and 6016: New Medicaid Transfer of Asset Rules Under the Deficit Reduction Act of 2005*, § 3 (July 27, 2006), *available at* www.cms.gov/smdl/downloads/TOAEnclosure.pdf (discussing the 2005 provisions regarding the purchase of promissory notes).[11]

The Social Security Administration has published the Program Operating Manual System ("POMS"), which is a statement of the "publicly available operating instructions for processing Social Security claims." *Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 385 (2003). "While these administrative interpretations are not products of formal rulemaking, they nevertheless warrant respect." *Id.* (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-140 (1944)); *see also James v. Richman*, 547 F.3d 214, 218 n.2 (3d Cir. 2008). Local county welfare agencies that review applications for Medicaid eligibility are guided by POMS. The Third Circuit, too, has cited POMS in an analogous case. *Sable v. Velez*, 437 Fed. App'x 73, 77 (3d Cir. 2011) (non-precedential) (*"Sable II"*). Thus, while POMS cannot thoughtlessly or rigidly be transplanted from the Social Security context to the Medicaid context, it is entitled to consideration. Applying POMS, the Third Circuit has stated:

> [1] the first step in that analysis is to determine whether the notes qualify under the regular SSI resource-counting rules as cash loans or promissory notes according to [the POMS].
>
> . . .

---

[11] Confusingly, however, the SSI regulations list a promissory note as a resource that is "ordinarily" considered "liquid," *i.e.*, convertible to cash within 20 days. 20 C.F.R. § 416.1201. This tends to suggest that a promissory note, however bona fide, is a countable, available asset, rather than the opposite. In any case, Plaintiffs appear to be attempting to demonstrate that the "ordinary" rule of liquidity does not apply to these instruments.

[2] If the notes do not qualify under either category, then the analysis proceeds to whether the note are to be considered as trust-like devices pursuant to the POMS § 1120.201.

*Sable II*, 437 Fed. App'x at 76 (paragraph break and numbering added). *See also* POMS SI § 01120.201(G)(1) (the SSA "will not consider these arrangements under trust rules if they would be counted as resources under regular [Supplemental Security Income ("SSI")] resource-counting rules"); *Wesner v. Velez*, No. 10-308, 2010 WL 1609674 (D.N.J. Apr. 19, 2010) (first analyzing promissory note as a promissory note and cash loan, and thereafter applying the trust-like device criteria). The Third Circuit has affirmed (albeit in unpublished opinions) what is implicit in the POMS and the SSI rules: "[T]he trust-like device analysis is secondary to the regular analysis." *Sable v. Velez*, 388 Fed. App'x 235, 238 (3d Cir. 2010) (non-precedential) ("*Sable I*"); *see also Sable II*, 437 Fed. App'x at 75-77.

Plaintiffs claim in effect that qualification under the first, "promissory note" step may exclude consideration of the second, "trust-like device" step. A particular instrument, however, might turn out to be available and countable under both. *See Sable I*, 388 Fed. App'x at 238 & n.4.[12] Of course, if an instrument were found to be an available, countable resource under the promissory note analysis, that would tend to make the trust-like device analysis superfluous. *See Sable II*, 437 Fed. App'x at 76. Thus POMS SI § 01120.201(G)(1), quoted above, provides that the SSA will not consider the trust analysis if particular instruments "would be counted as resources" under regular resource-counting rules. It is in that sense that the trust-like device analysis is "secondary." But I see no reason that a court or agency could not consider both steps in a particular case – either because an instrument would *not* be counted under the promissory note analysis, or just out of thoroughness. The overarching issue is whether the resource is one that is

---

[12] The *Sable I* court noted:

Appellants claim a promissory note can never be treated as a trust-like device under 42 U.S.C. § 1396(d) because such treatment would render § 1396p(c) meaningless. But the two subsections do not affect each other. Subsection (d) addresses counting resources for eligibility, whereas subsection (c) addresses punishing sham transactions in which assets are transferred for less than fair market value. Because the two are different, instruments can be relevant under both subsections.

388 Fed. App'x at 238 n.4.

available to the applicant and available and countable in the means-testing process.

Accordingly, the analysis below considers these instruments both as notes or loans, and as trust-like devices. To prevail, Landy and Sauchelli must establish that it was improper for DHS to treat the Promissory Notes as available resources under either analysis.

B. "Cash Loans"

1. *Governing Standards*

A bona fide informal cash loan will not be treated as an available, countable resource. POMS requires a cash loan to be a "negotiable, bona fide loan agreement." POMS SI § 01120.220(B)(2)(a). To be bona fide, an informal cash loan[13] must (1) be enforceable under state law, (2) be in effect at the time of the transaction, (3) contain an acknowledgement of an obligation to repay and (4) have a plan for repayment (5) which is feasible in light of "the amount of the loan, the [borrower]'s resources and income, and the [borrower]'s living expenses." POMS SI § 01120.220(D)(1)-(5). Money that has been lent out may nevertheless be considered a resource if "the lender can access it for his or her own use." POMS SI § 01120.220(B)(2)(b).

If the loan agreement is bona fide, then POMS creates a presumption that the loan is a cash loan: "Assume that the bona fide loan agreement is negotiable and is a resource, unless the lender raises questions about the negotiability of the agreement and wants to rebut this assumption." POMS SI § 01120.220(D)(3)(b). The meaning of "negotiable" is not altogether clear. Viewed in the context of the eligibility requirements, it might mean "readily turned into cash in some established market," and therefore "available" to the noteholder as a resource. On the other hand, it might refer to any note that is not, by its terms, explicitly non-negotiable. Resolution of that question is not, however, critical to the decision here.

---

[13] POMS defines an informal loan as one "between individuals who are not in the business of lending money or providing credit." POMS SI § 01120.220(D). There is no contention that plaintiffs here are regularly in the business of lending money.

## 2. *Is the Landy April 16 Note a cash loan?*

As to the Landy April 16 Note (the earlier of the two Landy Notes), there is a short answer. It is unquestionably a countable, available resource because it is a demand note. The entire principal amount is due and payable whenever Landy decides to ask for it. (Statement of Undisputed Material Facts, Ex. A [ECF No. 40-1]). Amounts outstanding on a demand note are unquestionably available to the lender, who has the right, authority or power to liquidate this asset at will, N.J. Admin. Code § 10:71-4.1(c), and can "access it for his or her own use," POMS SI § 01120.220(B)(2)(b). True, there is always some credit risk – but Landy himself does not claim that the loan is unlikely to be repaid.[14] And if so much as $2,000 of the principal is available to Landy, then his resources exceed the threshold for Medicaid ineligibility.

In addition, the Landy April 16 Note does not qualify as an informal cash loan under POMS because it lacks a repayment plan that is feasible. In fact, it does not have a payment plan at all. And even if there were a payment plan, there still would be no evidence that, in scheduling the payments, Landy considered Deldor Realty's resources, income, expenses or liquidity. POMS SI § 01120.220(D)(5). The credit and judgment checks Landy obtained in October and November 2012 had no bearing on whether a repayment "plan" was feasible, because they occurred nearly six months after he executed the Note. At any rate, the credit and judgment checks were sketchy and incomplete.[15] Moreover, for the same reasons discussed in the following section, this loan would not qualify as bona fide.[16] Particularly in light of its demand feature, it

---

[14] An earlier certification by Landy's attorney-in-fact, Maureen Werntz, stated that the Landy October 29 Note (i.e., the later of the two) had been fully repaid. (Werntz Cert. ¶ 5 [ECF No. 45-1]). Rado's Certification, which is more recent, updates the payment history. Rado states that $137,500 of the two Notes' combined $200,000 principal amount has been repaid. It does not state any basis for applying payments as between the two Notes.

[15] There was a credit check (but not a judgment check) for "Nazar," and a judgment check (but not a credit check) for "Nazarzedeh." These names possibly designate the same person, but a check for one name would not necessarily yield information about the other. Nazar, or Nazarzedeh, evidently Deldor Realty's principal, signed the Notes on the corporation's behalf, but is not himself the borrower. (*See* Statement of Undisputed Material Facts, Exs. K, L [ECF No. 40-2]). There was no check of any kind for the actual borrower, Deldor Realty Corp.

[16] In the next section, I find that the POMS requires a bona fide note to be made in good faith. For substantially the same reasons that the Landy October 29 Note was not made in good faith, neither was the April 16 Note.

appears to be a blatant device to park cash with a third party while Landy applied for Medicaid benefits. In short, the Landy April 16 Note does not qualify as an informal cash loan that would be exempt from consideration as a countable and available resource.

### 3. *Is the Landy October 29 Note a cash loan?*

The Landy October 29 Note also does not qualify as an informal cash loan. DHS concedes that the Note meets the first four requirements – *i.e.,* that it (1) was enforceable under state law and (2) in effect at the time of the transaction, (3) contained an acknowledgment of an obligation to repay, and (4) had a plan for repayment. DHS contends, however, that the repayment plan was not feasible and that the loan was not made in good faith.

The repayment plan was not feasible because there is no indication that the Note took into account Deldor Realty's income, expenses, or assets. *See Wesner,* 2010 WL at *3 (holding that monthly repayment plan of promissory note was not feasible because of lack of investigation into the seller's financial condition at the time the note was executed). The credit report (dated October 20, 2010) was at least performed before the parties signed the Note. The credit check was not, however, on the borrower, Deldor Realty. Nor was it on Deldor Realty's principal and signatory to the promissory note, Ralph Nazar. The credit check was run on "R. Nazarzadeh." These discrepancies rob the credit report of meaning. In addition, a credit score, which is an extrapolation of an individual's credit history, is limited in scope. It is not a statement of a borrower's actual assets, expenses, and income, which POMS requires to demonstrate the borrower's ability to afford a repayment plan. The judgment search, dated November 15, 2010, likewise fails to establish that the repayment plan was feasible or that the lender was in good faith seeking to determine whether that was so; among other shortcomings, the search was run after the Note was signed.

Landy rejoins that the credit and judgment checks, although run after the note was signed, nevertheless preceded the advancement of funds. This, to be sure, could be an indicator of appropriate caution; on the other hand, it is just as consistent with a belated effort to dress up the loan, already a fait accompli, as bona fide. It is also true, as Landy points out, that the loans have in fact been repaid to the tune of over $100,000. POMS, however, emphasizes not hindsight, but the ordinary, forward-looking process of "writing" a loan. "An informal loan is 'written' when the parties to the loan commit to writing the terms of the agreement." POMS SI § 01120.220(D). It is at that point that the

feasibility of repayment should be evaluated. The judgment check and actual payments, which all came after the Note was signed, thus have little or no bearing on whether the repayment plan was feasible. The only information Landy had regarding feasibility of repayment prior to entering into the October 29 Note was a credit score for an individual whose name did not match the name of the borrower, or even that of the borrower's principal. In other words, he had no contemporaneous evidence that Deldor Realty's repayment plan was feasible. Hindsight, or actual subsequent repayments, are not relevant. The fact of repayment, for example, is just as consistent with a sham "loan" that was merely a means of temporarily parking cash with a trusted third party. For these reasons, the record before me does not establish that the October 29 Note is a bona fide loan under POMS.

DHS also argues that, to be bona fide, a loan agreement must be made in good faith. DHS points to POMS itself, which defines a "bona fide agreement" as one that is "legally valid and made in good faith." POMS SI § 01120.220(A)(3); *see also Wesner*, 2010 WL at *3 (late promissory note payments, lack of investigation into the financial condition of the seller, and applicant's misrepresentation on her Medicaid application that she was owed no money "place[d] the bona fides of the [n]ote in question."). Landy and Sauchelli dispute that good-faith-in-fact is an independent requirement; rather, they say, a loan must conclusively be considered bona fide if it satisfies the five informal criteria in POMS SI § 01120.220(D), quoted at p. 12, *supra*. To support their argument, they include an email from Paul Kryglik, the Director of the Social Security Administration's Office of Regulations, in which he states that "good faith" equates to four of the POMS criteria (he excludes the fifth requirement that the loan be enforceable under state law). (Pl. Preliminary Injunction Br., Ex. B [ECF No. 36-2]).

On this issue, I am guided, if not bound, by two non-precedential decisions of the Court of Appeals for this Circuit. *Sable v. Velez*, 388 Fed. App'x 235 (3d Cir. 2010) ("*Sable I*"); *Sable v. Velez*, 437 Fed. App'x 73 (3d Cir. 2010) ("*Sable II*"). Landy and Sauchelli point to a footnote in *Sable I*, stating that the district court on remand need not "determine whether the transactions had a 'loan purpose' because that requirement is not contained in the statute, regulations, or POMS." *Sable I*, 388 Fed. App'x at 238 n.5. That language, Plaintiffs argue, suggests that there is no requirement of "good faith" above and beyond satisfaction of the five criteria of POMS SI § 01120.220(D)(1)-(5), quoted at p. 12, *supra*. On remand, the district court first focused on the feasibility of the repayment plan. District Judge Thompson noted the lack of collateral and

the "lack of documented evidence of the borrowers' resources, income, or expenses." *Sable v. Velez,* No. 09-2813, 2010 WL 5140004 at *2 (D.N.J. Dec. 9, 2010). She held that, for this reason alone, the notes in question failed the POMS test. Judge Thompson then, however, analyzed the good faith issue, cautioning that the five POMS factors did not command "strict adherence," and that the court "cannot ignore evidence of bad faith simply because it does not fit cleanly into one of the five requirements of § 1120.220(C)." Judge Thompson noted that the loans in question were between family members; that some of the borrowers (who were plaintiffs' children) had power of attorney; that the loans were not backed by collateral or by evidence of the borrowers' ability to repay; that the timing of the loans just before plaintiffs' Medicaid applications was suspicious; and that the loans were in the exact amount required to bring plaintiffs below the resource limits for Medicaid eligibility, suggesting that this was their real purpose. 2010 WL 5140004 at *3. No fact in isolation was determinative, but, taken together, the facts suggested to Judge Thompson that the notes were not made in good faith but as part of a "purposeful attempt to thwart the Medicaid Statute's eligibility requirements." *Id.*

On appeal from that remand, *Sable II* affirmed and explicitly approved the district court's analysis. *Sable II,* 437 Fed. App'x at 76-77. The district court, *Sable II* held, had not fashioned its own test of "good faith." Rather, it had validly applied the requirement of POMS § 1120.220(A)(3) that loan agreements be made in good faith. The Court of Appeals "agree[d] with the District Court that based on these facts, the plaintiffs have not met their burden of showing a likelihood of success on the merits as to whether the instruments were bona fide agreements made in good faith – and thus, cash loans" within the regulatory definition.[17]

All of the foregoing suggests to me that the Court may, and must, review the loans for good faith. POMS, separate and apart from the five-factor test, imposes such an obligation of good faith. POMS SI § 01120.220(B)(3) ("A bona fide agreement is legally valid under the applicable State's law and made in good faith."). I follow the usual interpretive canon that a court must, if possible, give effect to "every clause and word of a statute and be reluctant to treat statutory terms as surplusage." *Race Tires Am., Inc. v. Hoosier Racing Tire*

---

[17] Landy and Sauchelli argue that *Sable I* and *Sable II* are, at best, mutually contradictory. I do not see a serious inconsistency. The difference in their language may reflect nothing more than an ambiguity about what is necessary, as opposed to relevant, to prove, as opposed to disprove, that a note is bona fide. If forced to choose, however, I would give greater weight to *Sable II,* the Third Circuit's l final word on this particular case after the development of a district court record on remand.

*Corp.*, 674 F.3d 158, 165 (3d Cir. 2012) (quoting *Tavarez v. Klingensmith*, 372 F.3d 188, 190 (3d Cir. 2004)); *United States v. Menasche*, 348 U.S. 528, 538-539 (1955); *see also Cammarano v. U.S.*, 358 U.S. 498, 505 (same principle applied to regulations); *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 668-69 (2007) (regulations); 17A Am. Jur. 2d Contracts § 377 (same principle applied to contracts). I am further persuaded by Judge Thompson's reasoning that "where strict application of the POMS might lead to an incongruent result," a court should consider "all circumstances in deciding whether the notes at issue are bona fide." *Sable v. Velez*, 2010 WL 5140004 at *3, *aff'd by Sable II.*

Good faith is not defined in POMS. An undefined statutory term is given its ordinary meaning, *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995), and I think that the ordinary meaning of good faith should apply here. That ordinary meaning typically includes honesty in fact. *See, e.g.,* N.J. Stat. Ann. § 12A:1-201 ("'Good faith' means honesty in fact in the conduct or transaction concerned."); *St. Paul Fire and Marine Ins. Co. v. Onvia, Inc.*, 196 P.3d 664, 667 (Wash. 2008) (*en banc*) ("a standard definition of good faith" includes "honesty and lawfulness of purpose"). And such a definition of good faith fits well with Judge Thompson's analysis, with which I agree.

Director Kryglik's definition -- that "good faith" is coextensive with the four informal loan criteria, and does not have any broader meaning – is contained in an informal communication, and therefore is not authoritative. I do consider it for its persuasive value as a statement of an official with expertise. I nevertheless find it unpersuasive because (1) it renders the phrase "good faith" surplusage; (2) it narrows the ordinary meaning of the term; (3) it is an informal, unofficial interpretation of a document that itself is not the product of formal rulemaking, and therefore does not merit any unusual deference; and (4) it could lead to incongruous results by nullifying the $2,000 available resource threshold for shrewd Medicaid applicants who can design loans that mechanically satisfy the POMS criteria.

In short, the Notes must have been entered into in good faith, in the ordinary sense of that word, to be bona fide under POMS. To determine whether a loan was entered into in good faith, a court should look at all of the facts and circumstances surrounding it. *See Sable*, 2010 WL at *3 (district court opinion); *see also Sable II*, 437 Fed. App'x at 77; *Wesner*, 2010 WL at *8. A nonexclusive list of factors that may play into this analysis include whether (1) the entities are related or are at arm's length; (2) the lender is in the

business of lending money; (3) the borrower has power of attorney over the lender; (4) the loan is backed by collateral; (5) documentation existed regarding the borrower's ability to repay the loan; (6) the date of the loan is close to the date the lender applied for Medicaid; (7) the amount of the loan brought the lender close to or under the maximum resource threshold for Medicaid eligibility; (8) payments on the loans were late; and (9) the loan was disclosed in the lender's Medicaid application. *Sable II*, 437 Fed. App'x at 77; *Wesner*, 2010 WL at *8.

I find that the Landy October 29 Note was not made in good faith. Some of these factors weigh in Landy's favor: for example, Deldor Realty has no power of attorney from Landy, and Landy disclosed the Note in his Medicaid application. The majority, however, are not. These loans were not arm's-length transactions in the marketplace, but informal loans between an employee and his former employer. Landy is not in the business of lending money. The Note is not backed by collateral of any kind. Landy did not timely obtain any objective assurance that Deldor Realty could repay the loan, and what assurance he did obtain was meager. The Landy October 29 Note was dated just three weeks before Landy submitted his Medicaid application. The Note reduced Landy's resources from approximately $101,000 to $1,000,[18] just under the $2,000 Medicaid resource limit.[19] Finally, and more generally, Landy's submissions state that the ostensible purpose of the loan was to provide Deldor Realty with "available cash for operating expenses during a business cycle downturn." (Statement of Undisputed Material Facts, Ex. C [ECF No. 40-1]). I do not find this business justification credible, given the lack of collateral for Landy's loan of virtually all of his money. Landy does not disclose any other reason or purpose (aside from evasion of Medicaid requirements) for making the loan, and there is no submission from Deldor Realty explaining why it took out the loan. While I do not impose a "loan purpose" litmus test, I think this circumstance may be considered as evidence bearing on the bona fides of the loan.

---

[18] Landy's Medicaid application listed one checking and one money market account, each of which was valued at approximately $500.00.

[19] I note, but place no reliance on, the fact that the payments on the Note were perhaps to some degree untimely. The October 29 Note required 25 monthly payments, resulting in a final payment date of November 2012. As of December 31, 2012, Landy was still receiving monthly payments of $2,500 towards the combined outstanding balance on both Notes. (Rado Cert. ¶ 3 [ECF No. 51]).The repayment checks came from Land Neil, which is associated with Deldor Realty but is a distinct corporate entity. (Statement of Undisputed Material Facts, Ex. T [ECF No. 40-2]).

In sum, the circumstances surrounding the Landy October 29 Note weigh against Landy's having entered into the Note in good faith. Viewed alone, each fact may not be conclusive, but together "they suggest a purposeful attempt to thwart the Medicaid statute's eligibility requirements." *Sable*, 2010 WL at *4 (district court opinion). I therefore find that Landy has fallen short of his burden of showing a likelihood of success on the merits as to whether the October 29 Note was a bona fide agreement made in good faith.

### 4. *Is the Sauchelli Note a cash loan?*

The Sauchelli Note is not a bona fide informal cash loan because its repayment plan is not feasible and the loan was not made in good faith.

The Sauchelli Note's repayment plan is not feasible because there is no indication that Sauchelli took into account Connolly's income, expenses, or assets. *See Wesner*, 2010 WL at *3 (holding that monthly repayment plan of promissory note was not feasible because of lack of investigation into the seller's financial condition at the time the note was executed). The credit report (dated January 4, 2012) was performed after the Sauchelli Note was executed on December 29, 2011. This tends to suggest that creditworthiness was added as window dressing, not investigated as a precondition to the agreement. The credit report, in any event, is a raw score that lacks the required information on Connolly's actual assets, expenses, and income. Because there was no feasible repayment plan, the Sauchelli Note was not a bona fide cash loan under POMS.

In addition, I find that the Sauchelli Note was not entered into in good faith. Connolly, the borrower, is a related party: she is Sauchelli's granddaughter. The agreement was not between entities bargaining at arm's length. Sauchelli is not in the business of lending money or extending credit. The loan was not backed by collateral. Only after the note was signed did Sauchelli receive the limited documentation concerning Connolly's ability to repay it. The loan was made approximately six weeks before Sauchelli submitted her Medicaid application.[20] *See Sable*, 2010 WL at *3 (district court opinion). The amount of the loan placed Sauchelli's resources just a couple of

---

[20] Although longer than the two or three week periods in the Sable cases, this six week interim is still quite short and is relevant to Sauchelli's intent to evade Medicare restrictions. Pursuant to the note, Sauchelli disbursed $60,000 on January 18, 2012 (four weeks before the date of her Medicaid application) and $18,000 on February 7, 2012 (one week before her application). (*Id.*, Ex R).

hundred dollars below the Medicaid eligibility limit. (Statement of Undisputed Material Facts, Exs. O-R [ECF No. 40-2]).[21] These facts significantly outweigh the timely repayment of the Sauchelli Note. And here, even more than in the case of Landy, there is no indication of any plausible, non-Medicaid-related purpose for the loan, either from the lender's or the borrower's point of view.

Taken as a whole, these facts suggest that Sauchelli entered into the Sauchelli Note to circumvent Medicaid's limits on available resources. I therefore find that Sauchelli failed to demonstrate a likelihood of success on the merits as to whether the Sauchelli Note was a bona fide loan made in good faith, as required by POMS SI § 1120.220(B)(3).

### C. Promissory Notes

Landy and Sauchelli argue that the Notes qualify as bona fide promissory notes. I find that they do not, for the same reasons that they do not qualify as informal cash loans. *See* Section II.B, *supra*.

A bona fide promissory note will not be treated as an available, countable resource. POMS defines a promissory note as "a written, unconditional agreement whereby one party promises to pay a specified sum of money at a specified time (or on demand) to another party." POMS SI § 01140.300(D)(1) and (B)(3). As with informal cash loans, the POMS requires that a "promissory note" be "bona fide" and "negotiable." POMS SI § 01140.300(D)(1) and (B)(3). "A bona fide agreement is legally valid under the applicable State's law and made in good faith." POMS SI § 01120.220(B)(3). The agency is to "assume, absent evidence to the contrary, that the written agreement is bona fide and negotiable." POMS SI § 01140.300(D)(1).

The presumption that a written agreement or promissory note meets these criteria does not apply here because the facts before this Court provide "evidence to the contrary," as outlined above. *See Sable II*, 437 Fed. App'x at 77. The facts show that the Notes were not bona fide or entered into in good faith. Therefore, I do not find it likely that DHS's failure to treat the Notes as promissory notes would be found improper. *Id.*

---

[21] The $78,000 Note was close to the amount Sauchelli withdrew from her Oppenheimer funds account, which was $80,160.40. (*Id.*, Ex. O). Her Medicaid application lists a checking account with a balance of $1,900 as her only resource. (*Id.*, Ex. G)

D. Trust-Like Devices

As discussed above, the Notes do not meet the criteria to be considered informal cash loans or promissory notes under SSI's regular resource-counting rules. The Court will nevertheless turn to step two of the analysis: whether DHS was entitled to consider these Notes to be trust-like devices under POMS SI § 01120.201. I conclude that it was. For this independent reason, Plaintiffs' claims are unlikely to succeed on the merits.

### 1. *Governing Standards*

The POMS states that a trust-like device involves (1) a grantor (2) who transfers property (3) to an individual or entity with fiduciary obligations (4) to be held, managed, or administered for the benefit of the grantor. POMS SI § 01120.201(B)(5) and (G)(1). The first two prongs are not disputed. The key issue is whether a fiduciary relationship exists between Landy and Deldor Realty, or between Sauchelli and Connolly.

In describing a fiduciary relationship, the New Jersey Supreme Court stated:

> [t]he essence of a fiduciary relationship is that one party places trust and confidence in another who is in a dominant or superior position. A fiduciary relationship arises between two persons when one person is under a duty to act for or give advice for the benefit of another on matters within the scope of their relationship.

*F.G. v. MacDonell*, 150 N.J. 550, 563, 696 A.2d 697 (1997). A fiduciary relationship may arise where "one or each of the parties, in entering the transaction, expressly reposes a trust and confidence in the other or because of the circumstances of the case, the nature of their dealings, or their position towards each other, such a trust and confidence is necessarily implied." *United Jersey Bank v. Kensey*, 306 N.J. Super. 540, 704 A.2d 38, 44 (1997). A court must look at all the facts and circumstances relevant to the case in determining whether a fiduciary relationship exists. *Clyde v. Hodge*, 460 F.2d 532, 535 (3d Cir. 1972).

The key issue is whether Deldor Realty received Landy's money, or Connolly received Sauchelli's money, with the understanding that they were to hold it in trust for the giver's benefit. Landy and Sauchelli argue that these are

not relationships of trust; rather, they are standard debtor-creditor relationships. DHS counters that these are informal fiduciary relationships and that the Notes therefore are trust-like devices.

## 2. *Are the Landy Notes trust-like devices?*

The facts relevant to the Landy Notes – indeed, the very irregularities in the loans, already pointed out -- imply that the relationship between and Landy and Deldor Realty was one of trust and confidence. Employers and employees can, of course stand in a fiduciary relationship. *See generally* 29 U.S.C. § 1002(21)(A) (ERISA includes as a fiduciary anyone with discretionary authority or responsibility in administering the employee benefit plan); *Vibra-Tech Eng'rs, Inc. v. Kavalek*, 849 F. Supp. 2d 462 (D.N.J. 2012) (stating that in New Jersey, an employee owes his employer a fiduciary duty of loyalty). Landy was a former employee of the borrower, Deldor Realty. Landy agreed to lend Deldor Realty $200,000, $100,000 of which had no certain repayment date. This suggests a greater degree of trust and confidence than is typical of a lender-borrower relationship. Landy did not obtain sufficient assurance, before he entered into the Notes, that Deldor Realty was creditworthy. The Landy Notes, totaling $200,000 and representing almost all of Landy's net worth, were not secured by any collateral. Landy, who is in his mid-eighties, is not in the business of lending money. Landy indicated in his interrogatory responses that Deldor Realty needed to borrow the money to address short-term cash flow concerns due to the economic downturn. Surely a marketplace lender at arm's length would have required some collateral before transferring his life savings to a borrower that was admittedly suffering cash flow problems. Yet Landy did no such thing. In short, the circumstances surrounding the Landy Notes suggest that Deldor Realty and Landy were in a relationship of atypical trust and confidence – in other words, a fiduciary relationship – whereby Deldor Realty was acting for Landy's benefit, holding the funds in anticipation of repaying them in installments.

## 3. *Is the Sauchelli Note a trust-like device?*

The facts and circumstances surrounding the Sauchelli Note, too, indicate that Sauchelli and Connolly are in a fiduciary relationship. First, Sauchelli is the grandmother of the borrower, Connolly. "Loans between close relatives . . . are often made in in an atmosphere of trust and confidence that is absent from marketplace loans." *Sable v. Velez*, No. 09-2813, 2009 WL 3379939 at *6 (trust-like device analysis for analogous promissory notes, affirmed by *Sable II*). Second, Sauchelli made no adequate investigation into

Connolly's ability to repay the note, as a lender in the marketplace surely would have done. Third, the manner in which the Note was repaid suggests that Connolly simply held the money in trust for Sauchelli. Connolly's checks do not have her name and address printed on them, suggesting that they are starter checks. (Statement of Undisputed Material Facts, Ex. Q). The repayment checks are numbered sequentially, which implies that Connolly wrote no other checks from that account for at least five months. (*Id.*). Taken together, those facts suggest that Connolly opened a new account specifically to receive and repay funds from the Sauchelli Note. In other words, it does not appear that Connolly borrowed the money for some personal purpose; rather, it appears that she simply held the money for Sauchelli's benefit. Fourth, the loans are not backed by any collateral. Taken together, these facts add up to an implied fiduciary relationship between Sauchelli and Connolly.

In short, Sauchelli and Landy have not satisfied their burden of showing that they are likely to succeed in demonstrating that DHS could not consider the Notes to be trust-like devices.

### III.   DHS'S Motion For Summary Judgment

I now turn to DHS's Motion for Summary Judgment. Because there is no genuine dispute as to any material fact and DHS is entitled to judgment as a matter of law, I will grant the motion.

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (summary judgment is appropriate where "there is no genuine issue of material fact to be resolved and the moving party is entitled to judgment as a matter of law."); *Alcoa, Inc. v. U.S.*, 509 F.3d 173, 175 (3d Cir. 2007). Summary judgment is desirable because it eliminates unfounded claims without resort to a costly and lengthy trial, *Celotex*, 477 U.S. at 327, but a court should grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

"[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The burden of showing that no genuine issue of material fact exists

rests initially on the moving party. *Celotex*, 477 U.S. at 323. Once the moving party has made a properly supported motion for summary judgment, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see *Anderson*, 477 U.S. at 247-48. In evaluating a summary judgment motion, a court must view all evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976).

Landy and Sauchelli stipulated to DHS's Statement of Undisputed Material Facts, and added a handful of additional facts, which DHS did not dispute. (Pl. Opp. at 5 [ECF No. 45]). Plaintiffs also acknowledged that "there are no issues of material fact in the case." (*Id.*). Although (somewhat inconsistently), Plaintiffs also listed a number of facts as disputed, none of those objections actually pose material issues of fact; rather, the disputed "facts" are quotations from DHS's brief with which Plaintiffs disagree.[22] Indeed, I agree with Plaintiffs that DHS makes certain statements of "subjective opinion" in its brief, and that I am not bound by such opinions. (Pl. Opp. at 6 [ECF No. 45]). The operative facts properly presented by affidavit in the summary judgment motion are not in dispute, and they compel judgment for DHS as a matter of law. Indeed, at oral argument, counsel for both parties agreed that the record was complete and that a decision on summary judgment would be appropriate.

Landy and Sauchelli's first, second, and fourth[23] causes of action state that DHS improperly treated the Notes as available assets. As explained above, DHS's analysis was proper. Plaintiffs' third, fifth and sixth claims allege that DHS improperly calculated the penalty period that flowed from Plaintiffs' antecedent gift transfers. Those three claims, however, depend on Plaintiffs'

---

[22] For instance, Landy and Sauchelli challenge the statement in DHS's brief that "Plaintiffs are attempting to circumvent this [resource eligibility] limit by asking others to hold their funds . . . ." (DHS Br. at 1 [ECF No. 40]. I have not adopted this imputation of motive from DHS's brief. Rather, I have analyzed the Notes in light of underlying facts that all parties agree to be true.

[23] The numbering of the causes of action in the Second Amended Complaint is confusing. The first three causes of action are numbered sequentially and the next two are listed as the "First" and "Second" Statements of Claim. (Second Am. Compl. at 9-14). Another statement of claim follows under a new header. For the sake of clarity, this Opinion will refer to the last three claims as the fourth, fifth, and sixth in the Second Amended Complaint.

prevailing on the first three; they stand or fall together. Summary judgment for DHS is appropriate.

## IV.   CONCLUSION

For the reasons stated above, Landy and Sauchelli's Motion for a Preliminary Injunction is **DENIED** and DHS's Motion for Summary Judgment is **GRANTED**. An appropriate order follows.

KEVIN MCNULTY
United States District Judge

Dated: July 17, 2013